IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. CR-22-233-SLP-1 |
| ) | |
| ANTONIO ORTIZ HERRERA, ) | |
| ) | |
| Defendant. ) | |

**O R D E R**

Before the Court is Defendant Antonio Ortiz Herrera's Motion to Suppress Evidence Obtained from Wiretaps, and Memorandum in Support [Doc. No. 225]. The Government has responded, *see* [Doc. No. 240], and the Motion is now at issue.

I. **Factual Background**

As part of an ongoing investigation into a drug trafficking organization ("DTO"), federal prosecutors filed wiretap applications for three cell phones they believed were used in connection with a conspiracy to distribute methamphetamine and cocaine. On March 16, 2022, the Government applied for an order authorizing it to intercept wire and electronic communications from a cellphone ("TT1") used by Defendant. *See* [Doc. No. 240-1]. The application was supported by an affidavit prepared by FBI Special Agent Marc Jones. *See id.* at 21–74. That same day, United States District Judge Stephen P. Friot issued an order authorizing the wiretap. *See* [Doc. No. 240-2].

On April 14, 2022, the Government filed an application for an order authorizing both the continued interception of communications from TT1 and the initial interception

of TT2, another cellphone used by Defendant. *See* [Doc. No. 240-3]. Special Agent Jones again submitted an affidavit in support of the application. *See id.* at 23–96. The same day, Judge Friot issued an order authorizing both requests. *See* [Doc. No. 240-4]. Finally, on May 5, 2022, the Government applied for an order to intercept communications from TT3, a cellphone used by codefendant Victoriano Neri Hernandez.[1] *See* [Doc. No. 240-5]. Special Agent Jones again prepared an affidavit in support of the application, *see id.* at 18–91, and Judge Friot again issued an order approving the wiretap. *See* [Doc. No. 240-6].

Defendant was arrested in connection with the conspiracy shortly thereafter. The 16-count Superseding Indictment [Doc. No. 175] charges Defendant with drug conspiracy (Count 1), possession of methamphetamine with intent to distribute (Counts 3 and 13), possession of cocaine with intent to distribute (Counts 5 and 14), distribution of methamphetamine (Counts 6, 8, and 9), manufacture of methamphetamine (Count 11), and maintaining a drug-involved premises (Count 15).[2] Defendant has moved to suppress the evidence derived from the wiretaps, arguing that the Government failed to satisfy the so-called "necessity requirement" under 18 U.S.C. § 2518(1)(c).

---

[1] Defendant asserts he has standing to challenge the TT3 wiretap because "cell phone calls to or from [Defendant] were intercepted pursuant to all three wiretap orders." Mot. [Doc. No. 225] at 1. The Government does not challenge Defendant's standing, so the Court need not address the issue. *See United States v. Faulkner*, 439 F.3d 1221, 1223 (10th Cir. 2006).

[2] Eleven other defendants were charged in the Superseding Indictment, though none joined this Motion or otherwise challenged the lawfulness of the wiretaps.

2

**II.     Legal Standard**

Pursuant to the Federal Wiretap Act, "the intentional interception of wire communications, such as telephone calls," is generally forbidden if "done without court-ordered authorization."  *United States v. Faulkner*, 439 F.3d 1221, 1223 (10th Cir. 2006) (quoting *United States v. Workman*, 80 F.3d 688, 692 (2d Cir.1996)).  Once a court has authorized a wiretap, however, the defendant bears the burden of proving the wiretap is invalid.  *United States v. Barajas*, 710 F.3d 1102, 1107 (10th Cir. 2013).  Each wiretap application must include, *inter alia*, "a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous."  18 U.S.C. § 2518(1)(c).  "This rule is known as the 'necessity requirement.'"  *United States v. Zapata*, 546 F.3d 1179, 1185 (10th Cir. 2008) (citation omitted).

Traditional investigate techniques include: "(1) standard surveillance; (2) questioning and interrogating witnesses or suspects, including through the use of grand jury proceedings; (3) search warrants; (4) infiltration of criminal groups by confidential informants and undercover agents; (5) pen registers; and (6) trap and trace devices."  *Barajas*, 710 F.3d at 1107 (*quoting United States v. Foy*, 641 F.3d 455, 464 (10th Cir. 2011)).  But the necessity requirement does not compel agents to "exhaust all other conceivable investigative procedures before resorting to wiretapping."  *Id.* (*quoting Zapata*, 546 F.3d at 1186).  Instead, the court "review[s] the government's actions in a common sense fashion, and consider[s] all the facts and circumstances in order to determine whether the government's showing of necessity is sufficient to justify a wiretap."

3

*Id.* (quotation omitted). In conspiracy cases, the goal of uncovering the size and scope of the conspiracy may justify the authorization of wiretaps. *Id.*; *see also Foy*, 641 F.3d at 465 ("[W]e have held on numerous occasions that the law enforcement goal of uncovering the size and scope of the conspiracy may justify the authorization of wiretaps.").

### III.   Discussion

Special Agent Jones described the "ultimate goal" of the investigation as "identify[ing] all persons involved in this illegal activity and gather[ing] evidence sufficient to successfully prosecute each of these individuals." Resp. [Doc. No. 240] at 4 (quoting TT1 Aff. [Doc. No. 240-1] at 46) (citing TT2 Aff. [Doc. No. 240-3] at 64; TT3 Aff. [Doc. No. 240-5 at 58–59). Defendant's sole contention is that none of the supporting affidavits satisfy the necessity requirement. On the contrary, he argues all three affidavits "completely undercut the purported 'necessity'" because they "show traditional investigative means were working and uncovering considerable evidence." Mot. [Doc. No. 225] at 3. Defendant stresses that, while no individual traditional investigative technique could "uncover the identities of all co-conspirators and the scope of the conspiracy," that investigators should have applied a variety of those techniques before resorting to wiretaps. *Id.* at 3–4. The Government contends that Defendant "does not make an honest attempt to address the individualized reasons provided for why a Title III wiretap was necessary in this case." Resp. [Doc. No. 240] at 5.

The supporting affidavits detail the alternative investigative procedures used, the techniques considered but deemed unlikely to succeed, and the reasons wiretaps were needed to achieve the investigation's ultimate goals. Contrary to Defendant's assertion

4

that investigators relied on "boilerplate language and conclusory statements," Mot. [Doc. No. 225] at 3, the affidavits provide "a full and complete statement" that is specific to this investigation. 18 U.S.C. § 2518(1)(c). Upon review, the Court finds the Government sufficiently established that wiretaps were necessary to determine the size and scope of the conspiracy.

## A.     Confidential Informants and Undercover Agents

Defendant characterizes investigators' use of confidential informants as a "smashing success," noting that two confidential sources completed a series of controlled transactions with Defendant. Mot. [Doc. No. 225] at 4. Nevertheless, the Government contends that the compartmentalized nature of the DTO prevented those informants from making progress toward the investigation's ultimate goal. *See* Resp. [Doc. No. 240] at 6–8.

As set forth in the affidavits, two confidential informants purchased cocaine and methamphetamine from Defendant in a series of controlled buys. *See* TT1 Aff. [Doc. No. 240-1] at 33; TT2 Aff. [Doc. No. 240-3] at 52–53. But Defendant used one cellphone to communicate with lower level DTO members and customers—including the informants—and another to contact more trusted members of the DTO, including codefendant Neri. *See* TT2 Aff. [Doc. No. 240-3] at 59, 66–68. In the affidavit supporting the TT3 application, Special Agent Jones, who described the informants as having a "customer/supplier" relationship with Defendant, doubted that Defendant would introduce "a mere customer" to higher-level members of the DTO like codefendant Neri. TT3 Aff. [Doc. No. 240-5] at 61. Accordingly, the Court agrees that the affidavits indicate "the use of confidential informants would not accomplish the investigation's goal." Resp. [Doc. No. 340] at 6.

And although undercover agents were not involved in the investigation, the Government argues their effectiveness would have been limited for similar reasons. As detailed in the affidavit for TT1, agents determined that there was no information to suggest an "undercover agent would gain any additional access to the group that [the confidential informant] has not obtained." TT1 Aff. [Doc. No. 240-1] at 49. Thus, the use of undercover officers "reasonably appear[s] to be unlikely to succeed if tried." 18 U.S.C. § 2518(1)(c); *see also United States v. Verdin-Garcia*, No. 05-20017-01-JWL, 2005 WL 8164499, at *7–8 (D. Kan. Nov. 23, 2005), *aff'd*, 516 F.3d 884 (10th Cir. 2008).

B.   **Standard Surveillance**

Next, Defendant challenges the necessity of the wiretaps because "[t]he physical surveillance conducted was also successful" and "provided important evidence." Mot. [Doc. No. 225] at 4. The Government does not deny that the use of physical surveillance aided investigators, but instead expounds on the technique's limitations in identifying other members of the DTO. Specifically, the Government argues "[t]he intercepted communications were necessary in order to add context to [] exchanges and determine when and where the DTO was transferring and who was responsible for coordinating such transfers." Resp. [Doc. No. 240] at 10.

Though investigators conducted physical surveillance, the affiant believed it could only be used "to augment other investigative techniques" and could not "be relied upon, without more, for the successful prosecution of this DTO." TT1 Aff. [Doc. No. 240-1] at 50. For example, investigators surveilled Defendant's home, but "[a]ll activity was conducted behind a closed garage door." *Id.* at 51. And although investigators knew from

6

trap and trace devices that Defendant communicated with codefendant Yoelmmi Franco Sandoval during this same time, they had no information about either the content of the conversation or what took place in the garage. *Id.* Special Agent Jones also noted that DTO members "appear[ed] to be very conscious and adept at hiding their drugs during transportation," referencing hidden compartments that had been found inside of a camper shell. *Id.* at 50–51. Physical surveillance of codefendant Neri was even less successful because he was not directly involved in picking up drugs or money. *See* TT3 Aff. [Doc. No. 240-5] at 64.

Investigators also deployed at least seven pole cameras during the investigation, though the affidavits detail the shortcomings of this approach. For example, a camera was installed at the auto shop where the controlled drug buys occurred, but it could only confirm that meetings took place there. TT1 Aff. [Doc. No. 240-1] at 52. Similarly, surveillance cameras observed "two drug shipments that took place at [Defendant's] residences," but were again "not particularly useful in identifying what [] actually t[ook] place" behind the closed garage door. *Id.* Additionally, Special Agent Jones explained that cameras could not "be effectively deployed to cover every potential meeting spot." *Id.* at 52–53.

Next, the affidavits explained that a GPS tracking device was placed on Defendant's car. This device helped identify an address in Texas used as a money transfer location, but its limitations are similar to the surveillance cameras in that it could not provide any additional context about what Defendant did at these locations, or even who he met with. *See id.* at 53. Additionally, investigators were unable to track Defendant on two separate occasions after the device's batteries died during out-of-state trips. *See* TT2 Aff. [Doc. No.

240-3] at 72.  The affidavits indicate that investigators tried to place a GPS tracking device on another DTO member's car, but his sporadic movements made it impossible to do so within the required timeframe.  *See* TT1 Aff. [Doc. No. 240-1] at 53.  Law enforcement officers also employed a ping warrant on Defendant's phone to supplement physical surveillance, but that approach, like the GPS device, "only provide[d] general location data," rather than "details as to what [was] occurring inside the locations where [Defendant] may be."  TT2 Aff. [Doc. No. 240-3] at 73.

Finally, Special Agent Jones detailed the shortcoming of traditional surveillance techniques with respect to the goal of the investigation.  For example, he explained the "DTO's primary supply originates in Mexico," beyond the reach of traditional surveillance methods.  TT1 Aff. [Doc. No. 240-1] at 50.  Similarly, "at least some of the members of the targeted DTO reside in Mexico." *Id.* at 55.  Physical surveillance would therefore be unable to help identify these members or link them to the conspiracy.

Defendant's Motion supports the rationale set forth in the affidavits.  He argues he was "surveilled engaging in suspicious activity at his home, at the garage on N. Western Avenue,[3] at the residence in Venus, Texas, and making several alleged drug trips to and from North Carolina and other venues."  Mot. [Doc. No. 225] at 4.  But this suspicious activity took place behind closed doors and in vehicles, where traditional surveillance methods could not provide context about his meetings or movements.  Similarly, the GPS tracker battery died while Defendant was in North Carolina.  *See* TT2 Aff. [Doc. No. 240-

---

[3] The controlled drug buys took place at this location.

8

3] at 72.  Thus, the affidavits clearly detailed how law enforcement employed traditional surveillance methods and how those attempts were insufficient with respect to the goal of the investigation.  *Cf. United States v. Merton*, 274 F. Supp. 2d 1156, 1167–68 (D. Colo. 2003) ("For the most part, surveillance merely revealed the suspects in the company of other persons allegedly involved in the conspiracy.").

    **C.**    **Search Warrants**

Defendant argues that "[t]o the extent law enforcement was reluctant to use or did not utilize search warrants . . . there is nothing to suggest these ploys would have been ineffective," particularly because "the DTO was penetrated by a number of informants who were able to arrange controlled buys." Mot. [Doc. No. 225] at 5.  Prior to the authorization of the TT1 wiretap, law enforcement conducted a probable cause stop of a truck driven by Marco Flores Rodriguez.[4]  Earlier that day, Mr. Flores arrived at Defendant's house in a truck with a camper shell attached.  *See* TT1 Aff. [Doc. No. 240-1] at 33.  Defendant and Mr. Flores unloaded the camper shell and closed the garage door, blocking the investigators' view.  *See id.*  Two hours later, Defendant and Mr. Flores reattached the camper shell to the truck.  *Id.* at 33–34.  Mr. Flores drove away but was pulled over after committing several traffic violations.  *Id.* at 34.  A search of the truck uncovered $145,533 in drug proceeds and suggested the camper shell had previously been used to store cocaine and/or methamphetamine.  *See id.*

---

[4] Mr. Flores is not a defendant in this case.

As set forth in the TT1 affidavit, law enforcement considered searching Defendant's residence after the stop but decided this approach would not further the goals of the investigation. *See id.* at 56–57. Instead, they determined that a search and seizure of Defendant's residence would have merely disrupted the DTO and caused it to move operations away from Oklahoma City. *See id.* This prediction is bolstered by the fact that Defendant moved to a new house and began using a different cellphone shortly after Mr. Flores's traffic stop. *See* TT1 Aff. [Doc. No. 240-1] at 57–58. While targeted search warrants likely would have produced useful evidence, investigators were reasonably concerned that they would have also unduly alerted the DTO to the investigation and thwarted efforts to uncover the larger conspiracy. *Cf. United States v. Killingsworth*, 117 F.3d 1159, 1164 (10th Cir. 1997) (finding necessity requirement satisfied where, *inter alia*, search warrants "would notify the principals of the existence of the ongoing investigation").

    **D.**    **Questioning Witnesses and Using Grand Jury**

Like the previous point, Defendant argues that "[t]o the extent law enforcement was reluctant to use or did not utilize . . . grand jury subpoenas, [or] testimony from cooperators before the grand jury[,] . . . there is nothing to suggest these ploys would have been ineffective." Mot. [Doc. No. 225] at 5. As set forth in the Response, however, investigators weighed the potential risks and rewards of grand jury testimony but ultimately concluded this technique would not further the goals of the investigation. *See* Resp. [Doc. No. 240] at 15. Special Agent Jones provided four reasons for this conclusion "[b]ased on [his] experience and conversations with Assistant United States Attorneys for the Western

10

District of Oklahoma who primarily prosecute violations of federal law." TT1 Aff. [Doc. No. 240-1] at 64; *see also* TT2 Aff. [Doc. No. 240-3] at 84–85; TT3 Aff. [Doc. No. 240-5] at 81–82.

First, he explained that witnesses may be uncooperative because they would be asked to testify against "close confidants or family members." TT1 Aff. [Doc. No. 240-1] at 64–65. Next, Special Agent Jones stated "it would be unwise to seek any kind of immunity for these persons because this might foreclose prosecution of the most culpable members of this conspiracy." *Id.* at 65. Though he doubted the usefulness of the potential testimony—noting there was "no guarantee such immunized witnesses would provide truthful testimony before the Grand Jury"—he recognized the risk that immunized witnesses could "collaborate regarding their testimony" if subpoenaed. *Id.* Third, he explained that "several targets are in Mexico, beyond the jurisdictional reach of the Grand Jury," and suggested that suspects with strong ties to Mexico may flee if subpoenaed. *Id.* Finally, he articulated that, "at a minimum, the issuance of Grand Jury subpoenas would likely result in the Target Subjects becoming more cautious in their activity and would significantly compromise [the] investigation." *Id.*

In reviewing the affidavits, the Court is mindful of the goals of the investigation. In that context, it is apparent that law enforcement could not rely on grand jury subpoenas to uncover the full extent of the conspiracy and gather evidence against all those involved, and that the use of such subpoenas may have impeded the investigation. *Cf. United States v. Garcia*, 232 F.3d 1309, 1314 (10th Cir. 2000) (upholding necessity of wiretaps where,

*inter alia*, "use of the grand jury would likely have alerted [the defendant] and his suppliers to the investigation, thus limiting its effectiveness").

Additionally, the affidavits show that investigators considered arresting potential cooperating co-conspirators but decided against this approach for many of the same reasons described above. For example, Special Agent Jones indicated that this approach could alert other members of the DTO and ultimately set the investigation back, particularly given the compartmentalized nature of the organization. *See* TT1 Aff. [Doc. No. 240-1] at 65–68; TT2 Aff. [Doc. No. 240-3] at 85–88; TT3 Aff. [Doc. No. 240-5] at 82–86. The affidavits also discussed the aftermath of Mr. Flores's arrest, in which he "told investigators that he was in his uncle's truck and in Oklahoma to visit family." *See* TT1 Aff. [Doc. No. 240-1] at 68. Mr. Flores "refused to provide any information about the large quantity of cash found in the vehicle, his involvement with [Defendant], or his involvement with the DTO." TT3 Aff. [Doc. No. 240-5] at 86.

The Government also contends that a later traffic stop and high-speed chase yielded "a similar result," though the allegations in the TT3 affidavit do not necessarily support that conclusion. *See* Resp. [Doc. No. 240] at 16. During that incident, Oklahoma Highway Patrol attempted to conduct a traffic stop of two other co-conspirators. The two were apprehended after a high-speed chase, and twelve pounds of methamphetamine was found in their vehicle. *See* TT3 Aff. [Doc. No. 240-5] at 83. One codefendant was released "[a]t local law enforcement's decision" after being taken to the hospital, and the other quickly posted bail. *See id.* at 84. The affidavit states "[i]nitial reports from local law enforcement indicate there were no interviews attempted," but it is unclear whether federal agents

12

considered interviewing or arresting the two men. *Id.* This ambiguity does not necessarily prove fatal, however. *See United States v. Ramirez-Encarnacion*, 291 F.3d 1219, 1222 (10th Cir. 2002) ("[Courts] consider 'all the facts and circumstances in order to determine whether the government's showing of necessity is sufficient to justify a wiretap . . . .'" (quotation omitted)). The supporting affidavits' detailed allegations contradict Defendant's assertion that there is "nothing to suggest" grand jury subpoenas or cooperating co-conspirators' testimony "would have been ineffective." Mot. [Doc. No. 225] at 5.

      **E.**     **Pen Registers and Toll Records**

Defendant's Motion does not specifically address the Government's use of pen registers and toll records. Nevertheless, the Government asserts that they are "[p]erhaps the best example of the inadequacy of traditional investigative techniques." Resp. [Doc. No. 240] at 12. As set forth in the initial affidavit, "law enforcement had obtained toll records for several phones and a pen register on TT1." TT1 Aff. [Doc. No. 240-1] at 61–62. While this approach yielded useful information—including the "phone numbers Defendant contact[ed] during controlled drug purchases"—their efficacy was limited. *Id.* at 61. For example, even when combined with other techniques like physical surveillance, investigators could not "identify the parties to those conversations" or "identify the nature or substance of the conversations . . . to differentiate between legitimate calls and calls made for criminal purposes." *Id.* at 62. Additionally, Special Agent Jones explained that "individuals involved in drug trafficking often use phones that are not subscribed in the user's name," which "makes it particularly difficult to identify the members of the

13

conspiracy based on telephone data alone." TT2 Aff. [Doc. No. 240-3] at 82. Based on these assertions, it is clear that "the knowledge that these calls took place does not indicate the nature or scope of any criminal activity, and thus this data was insufficient to complete the investigation." *Garcia*, 232 F.3d 1309, 1315 (10th Cir. 2000).

### F.   Other Investigative Techniques

Though neither specifically enumerated in *Barajas*, 710 F.3d 1102, nor challenged in Defendant's Motion, the Government highlights several additional techniques it relied upon before resorting to wiretaps. For example, the affidavits establish that law enforcement searched financial databases prior to applying for the wiretaps at issue. *See* TT1 Aff. [Doc. No. 240-1] at 59–61; TT2 Aff. [Doc. No. 240-3] at 78–81; TT3 Aff. [Doc. No. 240-5] at 74–77. While this information suggested "that [Defendant] has been in some kind of business relationship with Neri since 2018," Special Agent Jones stated that additional investigation would likely prove fruitless because the DTO primarily used cash. TT1 Aff. [Doc. No. 240-1] at 60.

Additionally, the affidavits address law enforcement's decision not to use garbage seizures during the investigation. *See* TT1 Aff. [Doc. No. 240-1] at 63–64; TT2 Aff. [Doc. No. 240-3] at 82–84; TT3 Aff [Doc. No. 240-5] at 78–81. Investigators considered garbage seizures at several locations but concluded "the risk of attempting a trash pull is almost certainly eclipsed by the potential reward." TT3 Aff. [Doc. No. 240-5] at 80. For example, Defendant consistently waited until the morning of trash day to place his garbage at the curb. Investigators would have been forced to seize the trash during the day, increasing the risk Defendant would observe them. *See* TT1 Aff. [Doc. No. 240-1] at 63–64. And,

14

as set forth in the affidavit, "individuals involved in drug trafficking rarely dispose of significant evidentiary documents and materials . . . in garbage," supporting law enforcements' decision not to use this tactic. *Id.* at 63; *see also United States v. Castaneda-Ontiveros*, No. 2:17-CR-20074-04-JAR, 2019 WL 3891141, at *6 (D. Kan. Aug. 19, 2019) ("[T]he Tenth Circuit has never held that trash searches constitute normal investigative procedures that must be considered by the government before applying for a wiretap.").

Finally, the affidavits supporting the TT2 and TT3 applications discuss why previously intercepted wiretap communications were insufficient to achieve the investigation's goal. As set forth in those affidavits, the wiretap of TT1 provided an incomplete picture of the DTO because Defendant only used that device to communicate with customers and lower-ranking DTO members. [Doc. No. 240-3] at 89–90. Accordingly, Judge Friot authorized the wiretap of TT2—the device Defendant used to communicate with higher-ranking members of the DTO. Investigators subsequently determined that codefendant Neri, the owner of TT3, was "the primary point of contact in Oklahoma for the higher-ranking members in Mexico." TT3 Aff. [Doc. No. 240-5] at 87. Thus, the wiretaps on TT1 and TT2 could not accomplish the goals of the investigation.

**IV.     Conclusion**

After carefully reviewing all three supporting affidavits, the Court is satisfied that Government has provided "a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous." 18 U.S.C. § 2518(1)(c). In reaching

this conclusion, the Court has considered the investigative procedures as a whole, with a focus on the stated goal of the investigation.

The Government detailed several "traditional" investigative techniques that it employed—including physical surveillance, confidential informants, and pen registers. *See, e.g., United States v. Verdin-Garcia*, 516 F.3d at 890; *Killingsworth*, 117 F.3d at 1163. While Defendant asserts that "traditional investigative means were working and uncovering considerable evidence," Mot. [Doc. No. 225] at 3, the affidavits detail why these investigative methods were inadequate to achieve the "ultimate goal" of the investigation—"identify[ing] all persons involved in this illegal activity and gather[ing] evidence sufficient to successfully prosecute each of these individuals." Resp. [Doc. No. 240] at 4 (quoting TT1 Aff. [Doc. No. 240-1] at 46) (citing TT2 Aff. [Doc. No. 240-3] at 64; TT3 Aff. [Doc. No. 240-5 at 58–59).

To be sure, the Government did not exhaust all other investigative techniques before filing its wiretap applications, but the necessity requirement does not compel that result. *See United States v. Castillo-Garcia*, 117 F.3d 1179, 1187 (10th Cir. 1997) ("The 'necessity' requirement of Title III is not an 'exhaustion' requirement."), *overruled on other grounds by United States v. Ramirez-Encarnacion*, 291 F.3d 1219 (10th Cir. 2002). And when traditional investigative techniques were not employed, Special Agent Jones detailed why they would likely have been unsuccessful in this particular investigation. *See* 18 U.S.C. § 2518(1)(c) (requiring a "a full and complete statement as to whether or not other investigative procedures have been tried and failed *or why they reasonably appear to be unlikely to succeed if tried* or to be too dangerous" (emphasis added)). These detailed

16

allegations and reasoned conclusions are contrary to Defendant's assertion that the Government relied on "boilerplate language and conclusory statements" and sought the wiretaps as "a matter of routine." Mot. [Doc. No. 225] at 3, 5. Because Defendant has not carried his burden to prove the invalidity of the wiretap, *Barajas*, 710 F.3d at 1107, his Motion is DENIED.

    IT IS SO ORDERED this 11th day of July, 2023.

                                                  SCOTT L. PALK
                                                  UNITED STATES DISTRICT JUDGE